IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMANDA LYNN E.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   23-cv-3789** |
| | : | |
| **MARTIN J. O'MALLEY,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                    **July 22, 2024**

Plaintiff Amanda Lynn E. brought this action seeking review of the Commissioner of

Social Security Administration's decision denying her claim for Supplemental Security Income

(SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This matter

is before me for disposition upon consent of the parties.  For the reasons set forth below,

Plaintiff's Request for Review (ECF No. 9) is **DENIED**.

## I.    PROCEDURAL HISTORY

On January 25, 2017, Plaintiff protectively filed for SSI, alleging disability since

December 31, 2009, due to bipolar disorder, oppositional defiant disorder, depression, and

anxiety.  (R. 471-79).  Plaintiff's application was denied at the initial level, and upon

reconsideration.  (R. 150-65).  Represented by counsel, she requested a hearing before an

Administrative Law Judge (ALJ).  (R. 166).  Plaintiff's then-counsel withdrew her appearance

(R. 185), and Plaintiff, appearing pro se, testified at an administrative hearing on January 14,

2019 (R. 94-101).  Plaintiff subsequently appointed her current counsel as her representative.  (R.

234).  Plaintiff and a vocational expert (VE) testified at a February 6, 2020 administrative

hearing.  (R. 74-92).  Plaintiff and a different VE provided testimony at a May 11, 2022 administrative hearing.  (R. 43-73).  Plaintiff's alleged onset date was amended to January 25, 2017, her application date.  (R. 16).  On June 27, 2022, the ALJ issued a decision unfavorable to Plaintiff.  (R. 16-34).  Plaintiff appealed the ALJ's decision, and on August 7, 2023, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-12).

On September 28, 2023, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania, and she consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) on October 5, 2023.  (Compl., ECF No. 1; Consent Order, ECF No. 5).  On January 9, 2024, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 9).  The Commissioner filed a response on February 7, 2024, and, on April 8, 2024, Plaintiff filed a reply.  (Resp., ECF No. 11; Reply, ECF No. 14).

## II.     FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on August 26, 1988, and she was twenty-eight years old on her amended alleged onset date.  (R. 471).  She completed tenth grade and previously worked as a cashier, hostess, and stocker.  (R. 511).

### A.     Medical Evidence

The medical records show that, beginning in October 2015, Plaintiff received treatment for bipolar disorder and generalized anxiety at Concern Counseling.  (R. 589-94).  She complained of stress due to strained family relationships, especially with her mother.  (R. 584-608, 621-61).  At her final session in March 2018, she had an anxious affect.  (R. 621).  She

reported that she had missed treatment sessions for approximately three and a half months because she was busy taking care of her children and her home; she experienced anxiety, but she was doing better despite being off her medications for two months; the anxiety did not interfere with her ability to do chores; and her relationship was going well.  (*Id.*).

On April 26, 2017, the State agency psychologist Dr. Melissa Franks, Psy.D., opined that Plaintiff had moderate limitations with respect to her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, and complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 157).

On February 22, 2019, Frank Sergi, Ph.D., conducted an independent consultative psychological evaluation.  (R. 677-85).  Plaintiff reported that she was depressed more days than not and had panic attacks in crowds, difficulty sleeping, concentration difficulties, and short-term memory deficits.  (R. 678).  Upon mental status examination, her affect was constricted to the anxious range, she had a predominantly anxious mood, and her intellectual functioning appeared below average.  (R. 679-82).  Dr. Sergi diagnosed unspecified bipolar disorder and unspecified anxiety disorder, found her prognosis to be fair, and indicated that, based on Plaintiff's self-reporting, she could not manage her own funds.  (R. 681).

The psychologist concluded that she was moderately limited in her interactions with the public, supervisors, and co-workers, and in her ability to respond appropriately to usual work situations and to changes in a routine work setting.  (R. 684).

A second independent psychological evaluation was conducted on June 6, 2019 by Gregory Coleman, Psy.D.  (R. 689-96).  Plaintiff reported difficulty sleeping and nightmares, mild to moderate levels of depression, a moderate level of anxiety, and what she called OCD symptoms, i.e., pacing and needing to clean.  (R. 690).  Her recent and remote memory skills

were mildly impaired due to focus, inattention, and anxiety.  (R. 691).  Dr. Coleman diagnosed

major depressive disorder, mild to moderate, and generalized anxiety disorder.  (R. 692).  He

stated her prognosis was good, "given compliance with mental health treatment and finding

suitable full-time employment after completing of vocational training." (*Id.*).  He found that

Plaintiff had mild limitations in understanding and remembering complex instructions, carrying

out complex instructions, and making judgments on complex work-related decisions; and

moderate limitations interacting with supervisors, co-workers, and the public, and responding to

changes in a routine work setting.  (R. 694-95).

In 2019, Plaintiff began receiving mental health treatment from OMNI Health Services.

In her initial assessments, she reported feeling depressed and anxious every day, mood swings,

intermittent panic attacks, and racing thoughts.  (R. 715, 738).  The psychiatrist diagnosed

bipolar disorder, mixed, and unspecified anxiety disorder, and started her on Lamictal and

Vistaril.  (R. 717-18).  Plaintiff's goals included improving her relationships and interpersonal

skills, and her crisis plan further indicated that she had a history of trauma, flashbacks, and

nightmares.  (R. 712, 797).  She also told her therapist that she had gone on a summer vacation

with her mother and visited her mother's house for Christmas.  (R. 734, 763).  In December

2019, she reported that she was not taking her medications.  (R. 762).

On January 8, 2020, Plaintiff's primary care physician completed a Pennsylvania Medical

Assessment Form.  (R. 726-29).  The physician stated that Plaintiff was temporarily

incapacitated from any form of employment or training activity until April 10, 2020 due to her

bipolar disorder with mixed cycles and anxiety disorder.  (R. 728).  He indicated that the manic

and depressive symptoms included pressured speech, racing thoughts, easily distracted,

compulsive behavior, high energy, easily agitated, loss of interest and pleasure in activities,

irritability, low energy, fatigue, inability to concentrate and focus, and feelings of worthlessness.

(R. 729).

She reported to her therapist that she had made no or limited progress in reducing her anxiety and PTSD symptoms, which the therapist attributed to environmental stressors and lack of consistency in attending therapy.  (R. 753).  In March 2020, she indicated that she continued to have PTSD symptoms seven of out seven days and, in July 2020, she stated there was a slight reduction in PTSD symptoms to six out of seven days.  (R. 783, 792).  She also reported that she enjoyed, but was also stressed from, taking care of her children, who were home from school due to the COVID pandemic.  (R. 823-24, 835, 837).  Plaintiff claimed that she had taken on the role of a teacher, in addition to being a mother, a housekeeper, an entertainer, and a chef.  (*Id.*).  She explained that she was it her choice to be a "full time" mother.  (R. 823-24).  In addition, she told her therapist that she had to take her son to the emergency room after he was bitten by a tick on a family camping trip, where he tested positive for Lyme disease.  (R. 831).

In December 2000, Plaintiff underwent a psychiatric re-evaluation.  (R. 887).  She recounted a history of childhood physical and emotional abuse by her father and reported recurrent intrusive thoughts and images of this trauma, which have worsened since her father came to her house.  (*Id.*).  She said that her father harassed her whenever he was released from jail, and she was afraid to sleep because of recurrent nightmares and flashbacks.  (*Id.*).  The mental status examination showed she was anxious and depressed.  (R. 890).

Throughout 2021, Plaintiff reported worsening flashbacks, nightmares, problems sleeping, periods of high energy alternating with periods of depression, anxiety, stress, and panic attacks, and she further indicated she could possibly have ADHD.  (R. 812-13, 845, 848, 850, 866).  She also exhibited an anxious affect and was not compliant with her medication regimen.  (*Id.*).  However, over the course of the year, Plaintiff also reported periods of improvement.  (R. 843, 857, 862).

5

Plaintiff also told her therapist she advocated for her housing needs with her landlord and that, when her apartment had flooded, the neighbors helped move her things.  (R. 847, 854). Plaintiff went to Wildwood, New Jersey, with her best friend and family members, and she reported to her therapist that she had a good time.  (R. 859).  She further reported socializing with family and friends on several additional occasions in 2021.  (R. 839, 841, 847-48, 855, 988-89).

A psychiatric evaluation was performed in February 2022, and Plaintiff reported feeling stable on Trileptal and that she had stopped taking hydroxyzine and Buspar.  (R. 882).  She reported improved anxiety, mood, and sleep, and stated that she enjoyed walking on trails.  (*Id.*). In March 2022, Plaintiff told her therapist that she was looking for a new place to live because her apartment was being renovated, was hopeful about the future, and was keeping busy caring for her children and going on a monthly date night with her boyfriend and other friends.  (R. 981).  Subsequently, she reported to her therapist that she had cooked Easter dinner for her family and others.  (R. 989-90).

B.    **Non-Medical Evidence**

Plaintiff completed an adult function report on April 21, 2017.  (R. 526-34).  She stated that she lives with her children in an apartment.  (R. 526).  She gets very anxious, cannot handle being around people, and did not have much an education due to a learning disability.  (*Id.*).  She sometimes cannot fall asleep, which makes her very tired during the day.  (R. 527).  She takes care of her children, cooks, cleans, and does the laundry, although it sometimes takes her some time to perform household tasks.  (R. 527-28).  Plaintiff indicated that she only goes outside when needed.  (R. 529).  She walks, does not drive, and does not have a driver's license.  (*Id.*). She shops for food and things needed for her children when the stores are not crowded.  (*Id.*). She cannot handle a savings account, a checkbook, or money orders, and she often plays with her

children and watches movies with them.  (R. 530).  Plaintiff indicated that she rarely spends time

with others, she takes her children to the doctors and their school when needed, and she keeps to

herself.  (R. 530-31).  She endorsed problems with memory, completing tasks, concentration,

understanding and attention, following written instructions, getting along with others, handling

stress, and changes in routine.  (R. 531-32).  But she did indicate that she could follow spoken

instructions and gets along well with authority figures.  (*Id.*).  Plaintiff takes Topamax and

Buspar, which cause her to be sleepy, anxious, and to lose her appetite.  (R. 533).  She also

added that she had a difficult time filling out the report.  (*Id.*).

At the January 14, 2019 administrative hearing, Plaintiff testified that she had an IEP for

her learning disabilities since she was in high school, reads at the third grade level, and has

always had trouble being with other people, concentrating, and getting work done.  (R. 98-99).

She has depression and anxiety.  (R. 99-100).  Plaintiff further testified that she had a very

unsettled childhood and was hospitalized several times as a child.  (R. 100-01).

Plaintiff testified at the February 6, 2020 hearing that she lived with her two children,

ages 11 and 12.  (R. 78).  She rarely goes grocery shopping and does not go out alone.  (R. 80,

83).  As a child, her family moved frequently to hide from her abusive father.  (R. 81).  She

engaged in self-harm before she turned eighteen.  (*Id.*).  In 2008, she worked as a hostess in a

restaurant, but the job involved too many social interactions.  (R. 83).  She is not on social

media, has no friends, does not talk to anybody on the phone, and does not leave her home.  (R.

82, 84).  Plaintiff testified that she gets her children ready for school, walks one child to school

(the other child attends a cyber school), sits at home, and sometimes "I'll go crazy cleaning,

other times I can barely drag myself out of bed."  (R. 84).

She has problems breathing and sleeping, constant nightmares, and flashbacks about her

father, who continues to harass her with phone calls and letters as an adult, and once showed up

at her current address.  (R. 85-87).  Plaintiff also testified that she was the victim of a sexual assault during her childhood.  (R. 85-86).  She said that the flashbacks happen frequently, sometimes a few times throughout the day, and may last about an hour.  (R. 86, 90).  She usually makes doctor's appointments when the offices are less crowded.  She is accompanied by another adult to the medical appointments, like her boyfriend.  (R. 86-87).  She also contacted CareerLink about ten years ago, and she was told that she needed to seek help before returning because of her problems with anxiety and concentration.  (R. 87).  Plaintiff claimed that she had been on a medication that caused seizures and another drug that made her sleep constantly, which interfered with her duties as the sole caretaker of her children.  (*Id.*).

At the final administrative hearing held on May 11, 2022, Plaintiff testified that she has daily panic attacks, triggered by uncomfortable situations, that could last for days to a week.  (R. 53).  The panic attack symptoms include pacing, starting different tasks, talking very fast, stuttering, or just shutting down.  (R. 66).  She went to the emergency room during an attack because she believed she was having a heart attack, but she left due to the long wait and because she was "really freaking out" in the waiting room.  (R. 53-54).  She cannot focus during an attack, has difficulties getting along with others, and feels like no one else wants to be around her.  (R. 67).  Her father had recently been released from prison, which has caused her to suffer flashbacks to past traumatic events.  (R. 67-68).  Plaintiff also indicated that the medications do not help her over the long term.  (R. 54).

Plaintiff stated that her sleep fluctuates.  (R. 64).  Plaintiff does not drive, and her boyfriend drives her and her children to medical appointments and remains in the room with her.  (R. 55-56).  Plaintiff, her boyfriend, and her children go walking on trails where she is not surrounded by people, she does not "really" go to family parties because they usually end badly, she no longer has date nights with her girlfriend, and she did not leave the hotel when she went

to Wildwood.  (R. 56-57).  She attended classes at CareerLink, but there were too many people. (R. 60-61).  She was told to come back when she is "mentally ready."  (*Id.*).  She has one friend, and they talk on an irregular basis.  (R. 64-65).

### III.   ALJ'S DECISION

Following the administrative hearings, the ALJ issued a decision in which she made the following findings:

1.   The claimant has not engaged in substantial gainful activity since January 25, 2017, the application date (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairments: post-traumatic stress disorder (PTSD), bipolar disorder, and anxiety disorder (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations but [sic] is limited to performing work that needs little or no judgment to do simple duties that may be learned on the job in a short period of time; allows for no public contact and only occasional interaction with coworkers and supervisors; involves few changes in the daily work duties, schedule, and location; finally, the work should be goal oriented, meaning any production requirements can be accomplished by the end of the workday or shift.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on August 26, 1988 and was 28 years old, which is

defined as a younger individual age 18-49, on the date the application was filed

(20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past

relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security

Act, since January 25, 2017, the date the application was filed (20 CFR

416.920(g)).

(R. 19-34).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 3).


## IV.   LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that she cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result

> in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.      DISCUSSION

In her request for review, Plaintiff raises seven claims for review:

> (1) The ALJ wrongfully concluded the Plaintiff has moderate limitations rather than marked limitations.

11

(2) The hypothetical question posed by the ALJ to the VE did not include any reference to Plaintiff's PTSD and the limitations suffered by the Plaintiff.

(3) The ALJ did not properly apply Listing 12.15 regarding trauma and stressor related disorders to this case.

(4) The ALJ mischaracterized the activities of the Plaintiff.

(5) The ALJ "cherry-picked" evidence to support her conclusions.

(6) The ALJ failed to consider the three (3) areas of functioning.

(7) The ALJ committed error at Step 5 of the Evaluation.

(Pl.'s Br., ECF No. 9, at 2-3).  Plaintiff's arguments implicate two aspects of the five-step sequential analysis: (1) the ALJ's determination at step three that she did not meet or equal a listing; and (2) the ALJ's RFC assessment in between steps three and four.  The Commissioner argues that the ALJ reasonably concluded that Plaintiff's impairments did not satisfy the stringent criteria of any of the listings.  (Def.'s Br., ECF No. 11, at 4-11).  He further claims that the ALJ's comprehensive RFC determination is supported by substantial evidence and otherwise comports with the applicable legal requirements.  (*Id.* at 1-2, 11-16).  I agree with the Commissioner.

   A.   **Listings at Step Three**

      1.   **The Step Three Inquiry and the ALJ's Decision**

   Plaintiff challenges the ALJ's step three determination that his mental impairments did not meet or equal Listing 12.04 (depressive, bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), or Listing 12.15 (trauma- and stressor-related disorders). (Pl's Br., ECF No. R. 19-22).

   At step three, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings that prevent an adult, regardless of age,

education, or work experience, from performing any gainful activity.  20 C.F.R. § 416.925(a).
This inquiry functions to identify those claimants whose medical impairments are so severe they
would be found disabled regardless of their vocational background, making further inquiry
unnecessary.  *See, e.g.*, *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  The claimant bears the
burden of producing medical findings showing her impairments meet or medically equal a listed
impairment.  *See, e.g.*, *Burnett*, 220 F.3d at 120 n.2.  To meet this burden, the claimant must
establish all the requirements of the relevant listing.  *Sullivan*, 493 U.S. at 530 (claimant who
meets only some of the listing requirements, "no matter how severely, does not qualify"); *see
also Hartung v. Colvin*, No. 12-6155, 2016 WL 2910096, at *5 (E.D. Pa. May 19, 2016).
Meeting a listing cannot be based on diagnoses alone.  20 C.F.R. § 416.925(d).  Because
matching or equaling a listing at step three results in an automatic finding of disability, the
listings are strictly construed against claimants. *See Sullivan*, 493 U.S. at 530-32.

      Here, the ALJ identified Listings 12.04, 12.06, and 12.15 as relevant to Plaintiff's mental
health impairments, but, considering the criteria of paragraph "B," found her impairments were
not severe enough to meet the listing.  (R. 20-22).  Under paragraph "B," one extreme or two
marked limitations must be found in the following areas: (1) understanding, remembering, or
applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining
pace; or (4) adapting or managing oneself.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B),
12.06(B), 12.15(B).  A "marked limitation" means that the claimant's "functioning in this area
independently, appropriately, effectively, and on a sustained basis is seriously limited."  20
C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(d).  The ALJ determined that Plaintiff had: (1) a
mild limitation in understanding, remembering, or applying information; (2) a moderate
limitation in interacting with others; (3) a moderate limitation in concentrating, persisting or
maintaining pace; and (4) a moderate up to a marked limitation in adapting or managing herself.

(R. 20-22).  Because Plaintiff's impairments did not cause "at least two 'marked' limitations or one 'extreme' limitation," the ALJ concluded that the paragraph "B" criteria were not satisfied.  (R. 22).

The ALJ found that Plaintiff had a moderate limitation in interacting with others.[1]  (R. 21).  The ALJ acknowledged that Plaintiff had problems with being in public and in crowds and a history of difficulties getting along with others.  (*Id.*) (citing R. 526-34).  The ALJ specifically observed that her family relationships were strained, she had conflicts with her mother, aunt, and cousins regarding her parenting style, and she had been ridiculed by her family for her COVID decisions.  (*Id.*).

The ALJ weighed this evidence against Plaintiff's treatment records and her history of limited interactions with others to conclude that she was moderately limited.  (*Id.*).  The ALJ reasoned that Plaintiff could handle some personal interactions given the mental status findings of cooperative behavior, normal psychomotor behavior, and appropriate eye contact.  (*Id.*) (citing R 584-608, 621-61, 689-96, 730-49, 781-806, 838-953, 962-92).  Furthermore, the ALJ determined that she was able to go out in public, shop as needed, go on vacation, and socialize with trusted people or a small group.  (*Id.*).  The ALJ also found that she reported some positive interactions with her best friend and neighbors as well as strong relationships with her children.  (*Id.*).

As for concentration, persistence, and maintain pace, the ALJ recognized that Plaintiff testified to deficits in concentration/attention and memory, she had several familial, housing, and financial stressors, and reported frequent panic attacks.  (*Id.*).  The ALJ nonetheless concluded

---

[1]  Plaintiff does not develop any argument challenging the ALJ's determination that she had a mild limitation understanding, remembering, or applying information.  (R. 20-21); *see, e.g.*, *N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 492 n.2 (3d Cir. 2020) ("argument . . . vaguely presented without legal or factual support . . . is forfeited for lack of development").

that she had a moderate limitation in this area.  (*Id.*).  The ALJ pointed out that she generally presented as calm, cooperative, and collected with normal speech/tone, and the mental examination results typically showed good or intact attention/concentration, intact or only mildly impaired memory, and intact reality testing and logical thought processes.  (*Id.*) (citing R. 584-608, 621-61, 677-85, 689-96, 730-49, 781-806, 838-68, 900-53, 962-92).  Furthermore, as the ALJ noted, Plaintiff is the primary caretaker for her two sons, and she cooks, cleans the house, and attends to their needs by, inter alia, getting them to doctor appointments, and helping to homeschool them during COVID; she demonstrated the ability to advocate for herself and her children; and she reported being busy from the time she wakes up until she goes to sleep.  (*Id.*) (citing R. 807-68).

The ALJ found that Plaintiff had "a moderate up to a marked limitation" in the area of adapting or managing oneself.  (*Id.*).  She stated that Plaintiff recounted a history of childhood trauma and abuse with several inpatient hospitalizations and that she alleged that she had panic attacks, which can last for days.  (R. 21).  However, the ALJ further noted that Plaintiff admitted that her mother generally had her hospitalized whenever she acted up or to retaliate against her. (*Id.*).  It was again noted Plaintiff is the primary caretaker for her two sons and that she has demonstrated she can interact with others and advocate for herself and her children when necessary.  (*Id.* at 21-22) (citing R. 807-68).  The ALJ also observed that Plaintiff had not been hospitalized since age eighteen, she generally received routine and conservative treatment, none of her treating sources observed her having a panic attack, and, although she typically had anxious affect, she also tended to be cooperative with calm demeanor, normal speech, and good or fair insight/judgment.  (*Id.*) (citing R. 584-608, 621-61, 730-49, 781-806, 838-953, 962-92).

### 2.   Sufficiency of the Evidence

Initially, Plaintiff asserts that the ALJ wrongfully concluded that she had moderate, rather than marked, limitations because she does not interact with others with minor exceptions, rarely leaves her apartment and, when she does, is accompanied by her fiancé, and both Plaintiff and her therapist noted that Plaintiff is unable to concentrate or persist on a single task to completion. (Pl.'s Br., ECF No. 9, at 3).  In her reply, she similarly contends that she meets the paragraph "B" requirements because she does not interact with others with the exception of her fiancé and sometimes her family; has frequent problems with concentration, focus, staying on task and maintaining pace because of her flashbacks and panic and anxiety attacks; and testified that it is very difficult for her to sleep due to anxiety and flashbacks, she is afraid of being in a crowd or even a small group of people, leaves home infrequently to perform an activity with her children or fiancé or go to the grocery store with her fiancé, and does not go to public places or use social media.  (Reply, ECF No. 14, at 6).

However, the proper standard of review is not whether any evidence exists that might support Plaintiff's position, but instead, whether substantial evidence supports the ALJ's decision.  *See, e.g.*, *Stover v. Colvin*, No. 12-531, 2013 WL 2446469, at *3 (W.D. Pa. June 5, 2013) (citing *Allen v. Bowen*, 881 F.2d 37, 39 (3d Cir. 1989)).  The Court is "not permitted to re-weigh the evidence or impose [its] own factual determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).

Substantial evidence supports the ALJ's findings that Plaintiff could go out in public, socialize, and serve as the primary caregiver and advocate for herself and her two children.  (R. 21-22).  For instance, Plaintiff reported to Dr. Coleman that she socialized with her boyfriend and children daily.  (R. 692).  She told her therapist she was going on monthly dates with her boyfriend and other adult friends and that she had a good time going to Wildwood.  (R. 859,

981).  She further stated in her adult function report that she shops for food and other items in stores when they are not crowded.  (R. 529).  She testified that she sometimes goes shopping and to medical appointments with her fiancé.  (*See, e.g.*, R. 55-56, 63).  Additionally, Plaintiff cooks, cleans, and helped homeschool her children, and she also confronted her landlord about her housing needs.  (*See, e.g.*, R. 527-28, R. 823-24, 835, 837, 847, 854).

There is also evidence to support the findings by the ALJ regarding Plaintiff's generally unremarkable mental status examinations and the conservative treatment she had received since turning eighteen.  (R. 21-22).  The ALJ properly observed that she presented as calm, cooperative, and collected with normal speech/tone, and the mental examination results likewise typically showed good or intact attention/concentration, intact or only mildly impaired memory, intact reality testing and logical thought processes, and good or fair insight/judgment.  (*Id.*) (citing R. 584-608, 621-61, 677-85, 689-96, 730-49, 781-806, 838-68, 900-53, 962-92).  Furthermore, despite her claims of frequent panic attacks lasting for days (*see, e.g.*, R. 53), it is undisputed that none of her treating sources have witnessed her having an attack (R. 21).

Accordingly, I conclude that Plaintiff's argument that the ALJ erred by finding that she had moderate limitations in the areas of social functioning, concentration and pace, and managing or adapting oneself is without merit.

### 3.    Allegedly Mischaracterized Evidence

Plaintiff posits that the ALJ mischaracterized the evidence in her step three analysis. (Pl.'s Br., ECF No. 9, at 7-8).  Specifically, Plaintiff states that the ALJ erred by finding that she has regular contact with others, can handle some social contact and interaction, and keeps busy caring for her children and going on monthly outings with her boyfriend and other friends.  (*Id.*). She indicates that such findings are inconsistent with the ALJ's own statement at the May 11, 2022 administrative hearing that walking on trails is an occasional and very isolated activity and

Plaintiff's testimony that, except for the Wildwood trip, during which she never left the hotel, she does not go on vacation and that grocery shopping is done with her fiancé.  (*Id.*).  She also states that the medical records cited by the ALJ do not indicate that she had regular contact with anyone besides her doctors, therapists, and fiancé, and she asserts that her contact with other family members is severely limited and usually ends with her walking away anxious and upset.  (*Id.* at 8).  In her reply, Plaintiff reiterates her assertions that the ALJ mischaracterized the evidence of her daily activities and interactions with others.  (Reply, ECF No. 14, at 1-2).  She further notes that she testified that she does not take her children to medical appointments without her fiancé and that she does not participate in small groups.  (*Id.* at 2-3).

Plaintiff is incorrect to suggest that the ALJ concluded that she "regularly" participated in activities like shopping or socializing with others.  In fact, the ALJ never said that Plaintiff regularly engaged in such activities.  Furthermore, Plaintiff claims that the ALJ committed a "significant error" by finding that Plaintiff can "handle some contact and interaction" because "there is no mention [in the record] of her having regular contact with anyone other than her doctors or therapists, her fiancé, and infrequent contacts with her family and, when necessary, with her landlord."  (Pl.'s Br., ECF No. at 8).  However, this finding that "she can handle some contact and interaction" is not inconsistent with Plaintiff's admission that she had "regular" contacts with select individuals and "infrequent" (i.e., "some") contact with others.  (R. 21).  Furthermore, as Plaintiff acknowledges, she does, at least occasionally, go shopping and to medical appointments with her fiancé.  (*See, e.g.*, Pl.'s Br., ECF No. 9, at 7-8; Reply, ECF No. 14, at 1-2; R. 55-57, 529, 831).  Plaintiff also reported to her therapist that, on several occasions, she had a good time socializing with select groups of people and was busy caring for her children.  (*See, e.g.*, R. 841, 847, 859, 979, 981).

Accordingly, the ALJ did not mischaracterize the evidence at step two.

4.    **Alleged "Cherry-Picking" and Allegedly Sporadic and Limited Non-Workplace Activities**

Plaintiff argues that the ALJ "cherry-picked" evidence to support her conclusions.  (Pl.'s Br., ECF No. 9, at 9-10).  Specifically, Plaintiff indicates that the ALJ improperly relied on evidence of her sporadic and limited activities outside of the workplace to assess her limitations in a work setting.  (*Id.*).  She claims, for instance, that the fact she took a child to the emergency room does not mean anything other than that "she, despite her impairments, is a good mother." (Reply, ECF No. 14, at 2).  She also claims that the ALJ's reasoning "would commit the Plaintiff to a type of incarceration where she could not enjoy small pleasurable experiences such as going to dinner with her [f]iancé" and taking "a once-in-a-lifetime trip to a beach with an old friend." (*Id.* at 3).

Having reviewed the ALJ's decision, the Court does not agree with Plaintiff that the ALJ cherry-picked evidence. *See, e.g.*, *Piper v. Saul*, No. 2:18-1450, 2020 WL 709517, at *4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings.").  Instead, the ALJ acknowledged Plaintiff's family relationships were strained and recounted her history of difficulties with other people.  (R. 21). She recognized that Plaintiff could only socialize with trusted people or in small groups.  (*Id.*).  It was also acknowledged that Plaintiff reported experiencing frequent panic attacks, presented with anxious affect, and had a history of childhood trauma and hospitalizations, deficits in concentration/attention and memory, and many familial, housing, and financial stressors.  (R. 21-22).

Furthermore, an ALJ may consider a claimant's ADLs in her evaluation of the severity of the claimant's impairments in the areas of mental functioning under paragraph "B."

The listings explain that "you use the same four areas of mental functioning in daily activities at home and in the community that you would use to function in work," and,

accordingly, "[i]nformation about your daily functioning can help us understand whether your mental disorder limits one or more of these areas; and, if so, whether it also affects your ability to function in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(3)(b).  The listings state that, on the one hand, difficulty in an area of mental functioning at home or in your community may indicate that the claimant also would have difficulty in a work setting, while, on the other hand, the ability to use an area of mental functioning in day-to-day living may not necessarily mean that she could use that area to function in a work setting where the demands and stressors differ from those at home.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(3)(c). "We will consider all evidence about your mental disorder and daily functioning before we reach a conclusion about your ability to work." *Id.; see also* 20 C.F.R. § 416.929(c)(3)(i) (stating that claimant's daily activities is relevant factor to consider in assessing subjective complaints). Furthermore, "although certainly disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity, it is nonetheless appropriate for the ALJ to consider the number and type of activities in which the claimant engages." *Turby v. Barnhart*, 54 F. App'x 118, 121 n.1 (3d Cir. 2002).

The ALJ appropriately considered the totality of the evidence in its evaluation of Plaintiff's limitations in the areas of interacting with others, concentration, persistence, or maintaining pace, and adapting or managing oneself.  Taken together, Plaintiff's various activities, which include shopping in public, trips, monthly date nights, and family get-togethers, constitute substantial evidence supporting the ALJ's finding that she can handle some contact and interaction with others in a work setting.  (*See, e.g.*, R. 21-22, R. 529, 831, 839, 841, 847, 851, 859, 979, 981).  Furthermore, there is evidence that she is the primary caregiver for her family and could advocate for herself and her children.  (R. 21-22, 55-56, 527-28, 831, 835, 847).

In addition to considering evidence of daily activities, the ALJ also relied on the "routine and conservative" mental health treatment Plaintiff received since turning eighteen and Plaintiff's largely unremarkable mental status examinations. (R. 21-22). Substantial evidence supports the ALJ's assessment. (*See, e.g.*, R. 593, 597, 600, 602, 604, 606, 630, 632, 639, 660, 690-91, 731-32, 734-35, 737-38, 812-15, 884-85, 890, 895).

Accordingly, I conclude that Plaintiff's claims that the ALJ "cherry-picked" evidence and improperly relied on isolated and irrelevant activities are without merit.

### 5.    PTSD

Plaintiff further argues that the ALJ failed to consider her PTSD and its effects, especially her limitations in concentration, persistence, pace, or focus. (Pl.'s Br., ECF No. 9, at 3-6). She contends that she meets the paragraph "B" criteria because she spoke with her therapist, Dr. Coleman, and Dr. Sergi about her PTSD, suffers flashbacks that cause her to lose her concentration and focus, does not have any hobbies, left school in the ninth grade, does not perform at a peer level, and has OCD with poor impulse control. (*Id.*). She states that her PTSD limits every aspect of her life and asserts that the ALJ failed to meet her affirmative obligation to develop the record with respect to this condition, the frequency, and duration of, and Plaintiff's ability to recover, from her flashbacks. (*Id.*).

Plaintiff asserts in her reply that the presence of PTSD is not found through diagnostic medical exams but through therapy records and in some cases standardized written tests (which were not administered in this case), (Reply, ECF No. 14, at 4). She claims that the the ALJ failed to develop the administrative record by ignoring Plaintiff's PTSD despite the medical records indicating that her symptoms occurred six or seven days per week and Plaintiff's testimony that she had frequent flashbacks that were traced back to her traumatic family life and her ongoing fear of her father. (*Id.*). Plaintiff purportedly satisfied paragraph "B" because of her

flashbacks, panic and anxiety attacks, and difficulties sleeping.  (*Id.* at 6).  Plaintiff also claims

that she testified to her fear of being in a crowd or even a small group of people and that she only

leaves her home infrequently with her children or her fiancé.  (*Id.*).

I conclude that the ALJ properly considered Plaintiff's PTSD and its effects in her step

three analysis.  In this analysis, the ALJ did not expressly mention the flashbacks, nightmares,

and other sleep disturbances caused by her PTSD.  (R. 20-22; *see also, e.g.*, R. 68, 753, 782, 790-

92, 797-98, 812-13, 815, 845, 887).  But, at step two, the ALJ found that Plaintiff had the severe

impairment of PTSD, together with bipolar disorder and anxiety disorder.  (R. 19).  In her RFC

assessment, the ALJ acknowledged that Plaintiff reported that she suffered from flashbacks,

nightmares, and problems sleeping, and the ALJ concluded that, while Plaintiff had significant

work-related limitations associated with PTSD, depression, and anxiety, her limitations were not

work-preclusive, *see infra* Section V.B.4.  (R. 23-24, 26, 28-30).  The ALJ acknowledged at step

three that the Plaintiff had anxious affect and testified to deficits in concentration/attention and

memory, she had many familial, housing, and financial stressors, and recounted a history of

childhood trauma and abuse.  (R. 21-22); *see also, e.g.*, 20 C.F.R. Pt. 404, Subpt. P., App. 1 §

12.15(A) (providing paragraph "A" criteria for trauma and stress-related disorders, including

medical documentation of subsequent involuntary re-experiencing of the traumatic event,

disturbance to mood and behavior, and increases in arousal and reactivity).

The ALJ then appropriately weighed this evidence related to Plaintiff's PTSD and other

conditions against Plaintiff's generally normal mental status findings, including generally good

or intact attention/concentration and calm demeanor and normal speech; her ability to go out in

public and spend time with trusted people and care and advocate for herself and her family; and

the generally routine and conservative treatment she received.  (*Id.*; *see also, e.g.*, R. 529, 593,

600, 602, 604, 606, 630, 632, 639, 660, 690-91, 731-32, 734-35, 737-38, 812-15, 826-27, 831,

835, 837, 841, 847, 851, 859, 884-85, 890, 895, 979, 981).  This Court cannot re-weigh the evidence or impose its own factual determination.  *See, e.g.*, *Chandler*, 667 F.3d at 359.

Plaintiff argues that the ALJ failed to satisfy her obligation to develop the administrative record because she "did not ask a single question regarding PTSD" and "failed to inquire as to the frequency, length of time[,] and Plaintiff's ability to recover from these flashbacks."  (Pl.'s Br., ECF No. 9, at 5; Reply, ECF No. 14, at 4).  While the ALJ does have the burden of developing a full and fair record, *see Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995), the ultimate burden of proving disability within the meaning of the Act lies with the claimant.  *See* 42 U.S.C. § 423(d)(5)(A) (providing that "[a]n individual shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require").  "It is not unreasonable to require the claimant, who is in a better position to provide information about [her] own medical condition, to do so."[2] *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  Here, the record contains over four hundred pages of medical records, and, as Plaintiff explains, includes statements concerning her PTSD. (R. 581-992; Reply, ECF No. 14, at 4).  It is also undisputed that she testified that the flashbacks occur frequently.  (Reply, ECF No. 14, at 4).  Accordingly, the ALJ did not fail to develop a full and fair record regarding the step three inquiry and Plaintiff's PTSD.[3]

---

[2]  In the present case, the ALJ's duty to develop the record was not "heightened" as it would be with an unrepresented claimant because Plaintiff was represented by counsel at the start of the administrative process, at two out of the three administrative hearings, including the final hearing before the ALJ, and on appeal to the Appeals Council.  *See, e.g.*, *Smith v. Harris*, 644 F.2d 985, 989 (3d Cir. 1981) (finding that "where the claimant is unrepresented by counsel, the ALJ has a duty to exercise a heightened level of care and assume a more active role." (citation omitted)).

[3]  Plaintiff also suggests in passing that she meets the paragraph "C" criteria of Listings 12.04, 12.06, and 12.15.  (Pl.'s Br., ECF No. 9, at 6).  A claimant may satisfy the "C" criteria of Listings 12.04, 12.06 or 12.15 by showing that the claimant's mental disorder is "serious and persistent;" that is, that the claimant has a medically documented history of the existence of the disorder over a period of two years, and there is evidence of both: (1) medical treatment, mental

**B.      The ALJ's RFC Determination**

**1.      The ALJ's Decision**

After the step three listings determination, an ALJ must make an RFC assessment before moving to steps four and five of the disability evaluation. *See* 20 C.F.R. § 404.1520(a)(4); *Chandler*, 667 F.3d at 361. An RFC assessment determines "what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)." SSR 83-10, 1983 WL 31251, at *7 (Jan. 1, 1983). The ALJ must include all credibly established limitations in the RFC. *See, e.g.*, *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). Ultimately, the ALJ makes the RFC and disability determinations. *Chandler*, 667 F.3d at 361. Here, the ALJ found:

> [The claimant] can perform work at all exertional levels; but is limited to performing work that needs little or no judgment to do simple duties that may be learned on the job in a short period of time; allows for no public contact and only occasional interaction with coworkers and supervisors; involves few changes in the daily work duties, schedule, and location; finally, the work should be goal oriented, meaning any production requirements can be accomplished by the end of the workday or shift. The RFC places limits on the degree of social interactions allowed, and changes in the work setting, and accounts for stressful, fast-paced situations that may lead to panic attacks.

---

health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder, and (2) marginal adjustment, that is, minimal capacity to adapt to changes in the environment or to demands that are not already part of the claimant's daily life. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C), 12.15(C).

Plaintiff argues that she satisfies these two requirements because she has been in therapy for more than two years, the records demonstrate that the therapy is helping with some of her symptoms, and she does not leave her home unless she is accompanied by her fiancé. (Pl.'s Br., ECF No. 9, at 7). However, substantial evidence supports the ALJ's determination. (R. 22). As the ALJ noted (*id.*), Plaintiff has not had any inpatient hospitalizations since she turned eighteen, and, in any event, other evidence in the record indicates that she could leave her apartment without her fiancé. (*See, e.g.*, R. 859 (Plaintiff reporting to her therapist that she went down the shore with her best friend and family)).

(R. 30).  The ALJ explained that, while Plaintiff had significant work-related limitations associated with her depression, anxiety, and PTSD, her limitations were not work-preclusive. (R. 29).

The ALJ acknowledged Plaintiff's limited education and perceived intellectual deficiencies but also observed that the record reflects that her IQ is in the low average range.  (R. 29-30).  Plaintiff was also found to be a good and accurate historian and articulate advocate based on her demeanor, and, although she had a history of childhood trauma and significant psychosocial stressors, Plaintiff chose to be the primary caregiver and a "stay-at-home mother" for her sons because she wanted to raise them differently from how she had been raised by her mother.  (R. 30) (citing R. 807-37).

The ALJ further concluded that Plaintiff described a "rather broad" range of daily functioning, displayed a limited but adequate ability to interact with her providers, her children's providers, her boyfriend, her friend, and some family members.  (*Id.*).  The ALJ also stated that that Plaintiff was able to travel outside the home, drive a motor vehicle with her children in the car, interact with her landlord to secure necessary repairs, and work with neighbors to move her belongings.  (*Id.*).

The ALJ considered Plaintiff's insecurity around others, but she determined that Plaintiff demonstrated an adequate ability to focus and concentrate on those activities that would allow "some" interaction with coworkers and supervisors.  (*Id.*).  However, the ALJ found that she cannot have the kind of contact she had in her prior job attempts because they require frequent social interaction.  (*Id.*).  In addition, the ALJ observed that Plaintiff exhibited an ability to advocate for her children and provide excellent care for them.  (*Id.*).  In support of this conclusion, the decision cited to Plaintiff's advocacy regarding housing issues and her diligence in obtaining specialized medical care for her son with Lyme disease.  (*Id.*).  Furthermore, the

25

ALJ indicated that Plaintiff had driven on camping trips and trips to the shore and mountains. (*Id.*).  The ALJ also noted that she reported socializing with a best friend despite some friction in their relationship.  (*Id.*).

Finally, the ALJ observed that Plaintiff generally received routine and conservative treatment.  (*Id.*).  The ALJ's decision further noted that her mental status examinations were grossly normal, showing adequate functioning and stable moods with some waxing and waning symptoms due to stressors and medication adjustments, and that there were periods of medication non-compliance.  (*Id.*).

### 2.    Alleged Mischaracterizations of the Evidence

In challenging the ALJ's RFC determination, Plaintiff raises several arguments that are similar to the contentions she advances with respect to the ALJ's assessment at step three of the five-step sequential analysis.  *See supra* Section V.A.3.  Specifically, she notes that the ALJ recognized during the administrative hearing that her walking on trails was an occasional and isolated activity, and she further claims that her trip to Wildwood, where she never left the hotel, was an occasional act, any grocery shopping she does is done with her fiancé, and she did not socialize with anybody on a regular basis other than her fiancé.  (Pl.'s Br., ECF No. 9, at 7-8).  She argues that the ALJ mischaracterized her activities by singling out her attendance at a family children's party and stating that she "sometimes" attends family parties where "'sometimes attending' does not appear in the Transcript or Exhibits and these contacts [with her family] are very sporadic" and typically end with her leaving anxious and upset.  (*Id.* at 8).  The ALJ also allegedly erred by finding that she is able to drive a motor vehicle despite recognizing in the narrative summary of the Plaintiff's testimony that she does not operate a motor vehicle.  (*Id.*).  Another alleged error was stating that she socializes with her best friend, which is purportedly

contradicted by Plaintiff's testimony that, at most, they speak monthly and sometimes only once a year.  (*Id.* at 8-9).

In her reply, Plaintiff reiterates her claims that the ALJ did not accurately describe her activities.  (Reply, ECF No. 14, at 1-2).  She further indicates that she testified that she does not take her children to medical appointments without her fiancé being present in the room with them, that there are no date nights with her girlfriends, her contacts with her friends are sporadic, and she does not participate in any small groups.  (*Id.* at 2-3).

In her RFC assessment, the ALJ observed that Plaintiff exhibited a "rather broad range of daily functioning" and "a limited but adequate ability to interact" with others because, among other things, she could drive a motor vehicle.  (R. 30).  Specifically, the ALJ found that "[s]he is able to travel outside her home and drive a motor vehicle with her children in the car," and "[f]urther she has gone on camping trips and trips to the shore and mountains, driving a motor vehicle."  (*Id.*).  These statements are incorrect because there is no evidence in the record indicating that Plaintiff drives.  On the contrary, it is undisputed that she neither drives nor has a driver's license.  (*See, e.g.*, R. 79, 529).  In fact, the ALJ, in both her discussion of Plaintiff's limitation in the area of understanding, remembering or applying information at step three and in her narrative summary of the evidence for purposes of the RFC assessment, acknowledged that Plaintiff does not drive.  (R. 20, 24).  However, the ALJ's mischaracterizations with respect to Plaintiff's driving constitute harmless error.

"Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals."  *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (3d. Cir. 2009)).  An error is harmless when it does not affect the remainder of the analysis or the outcome.  *See, e.g.*, *Whitten v. Soc. Sec. Admin, Comm'r*, 778 F. App'x 791, 796 n.2 (11th Cir. 2019) (per curiam)

(citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)).  The plaintiff "therefore must '*explain* [ ] . . . how the . . . error to which [he] points could have made any difference.'"  *Id.* (quoting *Shinseki*, 556 U.S. at 409) (alteration in original).

   Plaintiff has failed to meet this burden because the ALJ provided "other specific and legitimate reasons that are supported by substantial evidence" for her RFC assessment.  *Alexander v. Saul*, 817 F. App'x 401, 404 (9th Cir. 2020) (discounting a medical source's opinion on a factually incorrect basis was harmless where the ALJ provided other reasons for the decision based in substantial evidence) (citing *Batson v. Comm'r of Soc. Sec Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)); *see also, e.g., Batson*, 359 F. 3d at 1197 (stating that any error committed by the ALJ in making a factually incorrect assumption was harmless because "there was substantial evidence supporting the ALJ's decision").

   Here, the ALJ explained that Plaintiff described a broad range of daily functioning and a limited but adequate ability to interact with others because she is able to travel outside of the home.  (R. 30).  The ALJ observed that Plaintiff interacted with her landlord, worked with her neighbors, advocated for and provided excellent care for her children and went on trips with her family and friends.  (*Id.*).  Furthermore, the ALJ provided several additional reasons for her RFC assessment, explaining that the record shows that Plaintiff's IQ is in the low average range of intellectual functioning; Plaintiff was a good and accurate historian and an articulate advocate for herself; the record generally shows only routine and conservative treatment; the serial mental status examinations are typically and grossly normal with some waxing and waning symptoms; and the record also contains evidence of medication non-compliance.  (*Id.*).

   In turn, the ALJ's additional RFC findings are supported by substantial evidence.  Apart from the ALJ's mistake concerning Plaintiff's driving, the ALJ did not mischaracterize the evidence in her RFC evaluation.  There is evidence that Plaintiff goes out shopping and enjoyed

socializing with others, including family members her fiancé, and her best friend.  (*See, e.g.*, R. 529, 831, 839, 841, 859, 979).  Plaintiff attends to her sons' needs by, among other things, helping to homeschool them during the height of COVID.  (*See, e.g.*, R. 55-56, 63, 527-28, 835).  She also reported advocating for herself and her family when her apartment was flooded.  (*See, e.g.*, R. 847).  Plaintiff does not dispute that she received conservative and routine treatment, and her mental status examination findings were generally unremarkable.  (*See, e.g.*, R. 593, 597, 600, 602, 604, 606, 630, 632, 639, 660, 690-91, 731-32, 734-35, 737-38, 812-15, 884-85, 890, 895).

### 3.    Alleged "Cherry-Picking" and Allegedly Sporadic and Limited Non-Workplace Activities

Plaintiff argues that the ALJ "cherry-picked" the evidence to support her conclusions and improperly relied on daily sporadic activities that had nothing to do with her capacity to work and disability.  (Pl.'s Br., ECF No. 9,  at 9-10; Reply, ECF No. 14, at 3-4).  She further asserts that the ALJ's reasoning would effectively limit her to a type of incarceration.  (Reply, ECF No. 14, at 3).

However, the ALJ did not cherry-pick evidence in support of her findings.  Instead, she specifically acknowledged in her RFC assessment that Plaintiff exhibited a "limited but adequate" ability to interact with a select group of other people.  (R. 30).  The ALJ similarly highlighted Plaintiff's limited education and perceived intellectual deficits, history of childhood trauma and significant psychosocial stressors, insecurity around others, and friction in her relationship with her best friend.  (R. 29-30).  Weighing all of the evidence, the ALJ concluded that Plaintiff could perform work at all exertional levels but with several additional mental limitations.  (*Id.*); *see also, e.g.*, *Chandler*, 667 F.3d at 359 (stating that courts cannot re-weigh the evidence).

Furthermore, the ALJ appropriately considered Plaintiff's daily activities as one factor in

evaluating her subjective complaints.  *See, e.g.*, 20 C.F.R. § 416.929(c)(3)(i).  In turn, although a

claimant need not be excluded from "all forms of human and social activity," the ALJ may

consider the number and type of activities in which she engages.  *Turby*, 54 F. App'x at 121 n.1.

The ALJ properly considered the overall "number and type of activities in which [Plaintiff]

engages," which include her actions as the primary caregiver for two sons and socializing with

others.  (*See, e.g.*, R. 30, 55-56, 527-28, 823-24, 831, 835, 839, 841, 847, 854, 981, 988-89).

        **4.**      **PTSD**

Finally, Plaintiff challenges the ALJ's RFC determination on the grounds that, although

the records "contain statements of the Plaintiff having PTSD which occurs 6 or 7 days weekly,"

the ALJ failed to consider the effects of her PTSD on her ability to maintain a regular work

schedule, with minimum absences, or to concentrate and focus in order to reach a competitive

level of performance.  (Pl.'s Br., ECF No. 9, at 3-6; Reply, ECF No. 14, at 4-5) (citing R. 782,

790-92, 797-98, 812-13, 815, 844-45, 887)).  Plaintiff contends that the ALJ erred by omitting

the limitations related to her PTSD, which she found to be a severe impairment at step two, in

her assessment of Plaintiff's mental health limitations at step five.  (Pl.'s Br., ECF No. 9, at 3-6,

10-11; Reply, ECF No. 14, at 4).  Plaintiff specifically indicates that the RFC should have

incorporated limitations for absenteeism, i.e., missing two days of work monthly, no interaction

with either co-workers or supervisors, and no ability to meet production requirements.  (PL.'s

Br., ECF No. 9, at 4).  She also posits that the ALJ failed to develop the administrative record

regarding her PTSD and to request an explanation for a gap in her treatment.  (Reply, ECF No.

14, at 4-5).

This Court concludes that the ALJ properly considered Plaintiff's PTSD in the RFC

assessment.  An ALJ must consider all medically determinable impairments in assessing a

claimant's RFC, including impairments that are not severe.  20 C.F.R. § 404.1545.  "Functional

limitations caused by all impairments, whether found to be severe or non-severe at step two, must be taken into consideration at steps three, four and five of the sequential evaluation." *Brown v. Astrue*, No. 09–3797, 2010 WL 4455825, at *4 (E.D. Pa. Nov. 4, 2010).

The ALJ found, at step two, that Plaintiff's PTSD was a severe impairment.  (R. 19).  In her summary of Plaintiff's testimony, the ALJ stated that she testified that, when she was a child, she was the victim of a sexual assault.  (R. 23).  Plaintiff, according to the ALJ, also testified that her family moved around a lot because they were hiding from her abusive father, she experiences frequent nightmares and flashbacks, and lives in fear that her father will find her.  (*Id.*).  It was acknowledged that Plaintiff reported to her therapist that she had nightmares and problems sleeping and told Dr. Sergi that she had difficulty sleeping.  (R. 26, 28).  However, the ALJ pointed out that she also reported that she was able to sleep through the night and cope with nightmares.  (R. 29).

Based on this factual recitation, the ALJ expressly recognized that Plaintiff had "significant work-related" limitations associated with her PTSD, depression, and anxiety, but she then determined that such limitations "are not work-preclusive."  (*Id.*).  In turn, the ALJ's assessment is supported by substantial evidence.  The ALJ weighed, on the one hand, Plaintiff's documented history of childhood trauma and significant psychosocial stressors, her limitations in social interactions , and her symptoms against, on the other hand, the fact that Plaintiff consciously chose to be the primary caregiver for her sons, her range of daily functioning and her limited yet adequate ability to interact with others, routine and conservative treatment, grossly normal mental status findings, and periods of medication non-compliance.  (*Id.; see also, e.g.*, R. 679-82, 831, 835, 859, 882, 981).  The ALJ specifically explained that "she cannot have the kind of contact and interaction she had in her prior job attempts, as a waitress and supermarket worker" because "[t]hese jobs involve frequent social interactions and contact."  (*Id.*).  However,

the ALJ reasonably determined that Plaintiff demonstrated an ability to focus and concentrate on activities to allow for some interaction with coworkers and supervisors. (*Id.*). Limitations were also added to account for work setting changes and stressful and fast-paced situations. (*Id.*).

Accordingly, I find that the Plaintiff's PTSD-related arguments are without merit.[4]

## VI.   CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**. An appropriate Order follows.

BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[4] Furthermore, to the extent that Plaintiff asserts that the ALJ failed to develop the administrative record regarding her PTSD (*see, e.g.*, Reply, ECF No. 14, at 4-5), I have considered and rejected this assertion in Section V.A.5. Plaintiff likewise argues that there is "[a]nother failure in the record when the record states that Plaintiff was absent from treatment for eighteen (18) months, but never requested an explanation for it." (*Id.*). However, the ALJ did not rely on this gap in treatment as a reason for concluding that she had significant but not work-preclusive limitations, and Plaintiff does not provide any explanation for how she was allegedly harmed by the ALJ's purported failure to request an explanation for the treatment gap. *See, e.g.*, *Conroy v. Leone*, 316 F. App'x 140, 144 n.5 (3d Cir. 2009) (the inclusion of only "one conclusory sentence" in an argument constitutes an "undeveloped argument [that] has been waived").